## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| LORI BERLINER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:13CV2070 RLW |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of Defendant's final

decision denying Plaintiff's application for Disability Insurance Benefits under Title II of the

Social Security Act. For the reasons set forth below, the Court affirms the decision of the

Commissioner.

## I. Procedural History

On August 27, 2009, Plaintiff filed an application for Disability Insurance Benefits

alleging disability beginning January 1, 2008 due to knee pain, migraine headaches, asthma,

carpal tunnel syndrome, depression, high blood pressure, restless leg syndrome, and obesity.

(Tr. 102, 189-98) The application was denied, and Plaintiff filed a request for a hearing before

an Administrative Law Judge ("ALJ"). (Tr. 74-75, 102-10) On July 15, 2010, Plaintiff testified

before an ALJ. (Tr. 51-67) On October 20, 2010, the ALJ determined that Plaintiff had not been

under a disability from January 1, 2008 through the date of the decision. (Tr. 79-90) Plaintiff

then filed a request for review, and on January 6, 2012, the Appeals Council remanded the case

to the ALJ for further proceedings. (Tr. 94-98) The ALJ held a supplemental hearing on May

14, 2012. (Tr. 29-50) On July 17, 2012, the ALJ again found that Plaintiff was not disabled.

(Tr. 9-24) The Appeals Council denied Plaintiff's request for review on September 10, 2013. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the July 15, 2010 hearing before the ALJ, Plaintiff was represented by counsel. Plaintiff testified that she lived in a house with her daughter, granddaughter, and two sons. Plaintiff had a twelfth grade education but no vocational training. She previously worked as a cashier and a manager, supervising about 10 people. Plaintiff also worked for Ronsick Oil Company as a bookkeeper. While employed there, she also called customers, place orders, and hired and fired employees. Plaintiff taught herself to use a computer but did take one online computer course. She was self-employed in Internet sales from January to August of 2008. (Tr. 54-57)

Upon questioning by her attorney, Plaintiff testified that she had been diagnosed with bipolar disorder by Paul Simon, D.O. Dr. Simon was not a psychiatrist, but he prescribed Plaintiff's medications which included Cymbalta. Plaintiff stated that her bipolar disorder caused her to be confused all the time. She felt "high" and also felt as though she were coming out of her skin. She experienced these episodes about once a month. The episodes could last between a half day and a couple of days. They also disrupted her sleep. Plaintiff stated that she experienced panic attacks while driving. She further testified that she suffered from depression since she was 22 years old. She sometimes did not want to get out of bed. Her depression worsened after her second divorce. However, her symptoms became severe over the past year-and-a-half. Plaintiff was able to travel to Florida for her son's wedding. (Tr. 58-64)

Plaintiff saw a counselor, Rebecca, once every six weeks. However, Plaintiff stopped seeing her three months prior to the hearing due to financial constraints. Plaintiff testified that

2

she was able to go to restaurants and take her kids to school. She enjoyed movies and was able to shop and gamble. Plaintiff stated that she chose not to spend her money on counseling because she did not think it helped, even though her doctors recommended counseling. Plaintiff acknowledged that she should take necessary steps to get better. (Tr. 64-65)

At the close of the hearing, the ALJ noted that she was keeping the record open to obtain records from Dr. Simon and Rebecca. The ALJ also summarized that the record indicated that Plaintiff was doing better on new medication. She had money for treatment but chose not to receive counseling. Plaintiff was able to attend her son's wedding in Florida, and she was well-groomed and obese. She possessed computer skills and had managed employees. The ALJ also noted inconsistent dates in the record. (Tr. 66-67)

Counsel also represented Plaintiff during the supplemental hearing. At the hearing held on May 14, 2012, Ms. Gonzales, a Vocational Expert ("VE") also testified. Upon questioning by the ALJ, Plaintiff stated that she had a 12th grade education and took a couple of college computer classes. Although Plaintiff reported being self-employed in 2007 and 2008, she did not recall such employment. (Tr. 29-33)

With regard to past employment, Plaintiff testified that she previously worked for Par Oil Company managing gas stations. She managed 6 to 8 employees that worked under her. Plaintiff also did the paperwork for the stations, first manually and later using a computer. She performed the same type of work for Ronsick Oil Company. Other previous jobs included working for Mosaic Sales Solutions, demonstrating printers and Gatorade Company, observing whether stores properly displayed Gatorade. Plaintiff did not recall what jobs she performed for Lawrence Service Company, Premium Retail Services, Keystone Marketing, Advantage Sales, King Sony Member, and Retail Marketing Professionals. She indicated that she worked

3

"mystery shop" jobs, checking to see whether the retail employees were properly performing their jobs. Plaintiff also worked as a home health aide. She had no training, but she helped her father walk, speak, and make business calls on behalf of her father's gas station and auto repair center. Her father's managers and accountant performed the paper and tax work. Plaintiff did not attend any classes since 2008 other than a driving class for a DUI. (Tr. 34-39)

Plaintiff's counsel also questioned Plaintiff regarding her physical and mental impairments. Plaintiff testified that she was diagnosed with arthritis, bursitis, asthma, depression, and bipolar disorder. She weighed 240 pounds. The ALJ noted that Plaintiff's mental health doctor, Dr. Simon, diagnosed depression but not bipolar disorder. Plaintiff stated that she had been seeing Dr. Simon consistently since before 2008 but that she refused to take prescription psych medications due to the cost and lack of insurance. Plaintiff amended her testimony to state that she does not take her medication as prescribed because the prescriptions are too expensive. Dr. Simon had not prescribed psych medication but gave her other, free medications to try. Plaintiff could not recall the names of the medications. Plaintiff did not see Dr. Simon every month. She stated that he would see her once every month to three months. Although she stated that she saw Dr. Simon on a consistent basis, the ALJ noted a two-year gap in treatment as well as several no-shows. Plaintiff testified that the records were mistaken. (Tr. 39-43)

Plaintiff further testified regarding her asthma. She stated that she had trouble breathing when going up steps or going outside when it was cold. She used an inhaler but sometimes required steroid shots in the winter or summer when her breathing was worse. Plaintiff saw Dr. Belancourt for asthma. The ALJ noted that Dr. Belancourt completed a residual functional capacity assessment but provided no clinical records in support. In addition, James Anthony, physical therapist, produced an assessment with no supporting physical therapy records. The

4

ALJ further noted that she needed clinical records from Jan Habreen and an unnamed doctor who provided psychiatric treatment. (Tr. 43-44)

The VE also testified at the hearing. Ms. Gonzales first questioned the Plaintiff regarding her work as a convenience store clerk. Plaintiff stated that she stocked shelves, ran the cash register, hired and fired employees, and placed orders. The VE classified Plaintiff's past work experience and transferable skills. Plaintiff worked as a convenience store clerk, which was light and unskilled; a retail manager, which was light and skilled; a telemarketer, which was sedentary and semiskilled; a stocker, which was heavy and semiskilled; a merchandise displayer, which was medium and semiskilled; a demonstrator, which was light and semiskilled; and a home health aide, which was medium and semiskilled. Transferrable skills included clerical, management, supervisory, computer, and sales. (Tr. 44-46)

The ALJ asked the VE to assume an individual limited to light exertional work. She should avoid fumes, odors, dust, and gases and could occasionally be exposed to extreme cold. Due to mental impairments, the individual was limited to unskilled work. The VE testified that Plaintiff would be unable to perform any past work because convenience store clerks were exposed extreme cold in the coolers. However, because the individual could occasionally be exposed to extreme cold, Plaintiff would be able to perform her past work as a convenience store clerk. Further, a hypothetical individual with the same educational skills, vocational skills, and residual functional capacity could also perform work as an order caller, mail sorter, and cashier. The VE stated that there was no conflict between the vocational evidence she presented and the information in the Dictionary of Occupational Titles ("DOT"). (Tr. 46-48)

Plaintiff's counsel also questioned the VE. Counsel added the limitation of inability to complete a normal workday or work week without interruptions from psychologically based

5

symptoms. In light of this limitation, the VE testified that the person would be unable to work competitively. She specified that if a person missed work more than two days a month, she would be unable to sustain employment. Further, if physical limitations prevented an individual from working two hours at a time, with scheduled breaks in between, she would not be able to work. At the end of the hearing, the ALJ left the record open for counsel to submit tax records and medical records to support the residual functional capacity assessments. (Tr. 48-50)

In a Disability Report – Adult, Plaintiff reported that she weighed 241 pounds and measured 5 feet, 7 inches. Her conditions that limited her ability to work included knee pain, migraine headaches, asthma, carpal tunnel syndrome, bipolar disorder, depression, restless leg syndrome, high blood pressure, and obesity. Her physical impairments limited her physical abilities and mobility. She had problems gripping, sitting in one position, standing for long periods, concentrating, interacting with others, and coping with stress. She stopped working on December 15, 2008. (Tr. 231-32)

Plaintiff's uncle, Robert McCullough, completed a Function Report – Adult – Third Party. He described Plaintiff's day as helping to get kids to school, going back to bed, showering, watching TV, taking care of kids for the evening, eating, and returning to bed. Plaintiff was able to feed her pets with the help of her kids. All she wanted to do was sleep. Plaintiff did not bother bathing or dressing because she did not go anywhere. She ate anything, anytime, because she was constantly hungry. Plaintiff had problems making decisions. She needed reminders to take medication because she forgot occasionally. She did not prepare meals and only ate junk food. Plaintiff performed no household chores because she had no motivation. Mr. McCullough tried to encourage Plaintiff to do things. Plaintiff was unable to breathe, bend, or walk without difficulty. She went outside when necessary and was able to drive. In addition,

Plaintiff could shop in stores, by mail, and online. She could not handle money. Mr. McCullough further reported that Plaintiff experienced mood changes that affected her decisions. Plaintiff enjoyed sleeping, watching TV, and shopping. She attended her children's activities and church. Mr. McCullough opined that Plaintiff's conditions affected her ability to stair climb, squat, kneel, bend stand, complete tasks, remember, and concentrate. She could walk only 100 feet before needing to rest for 10 minutes. Plaintiff was forgetful, and her ability to concentrate varied day to day. Plaintiff could get along with authority figures, but she was stubborn. Plaintiff did not handle stress or changes in routine well. (Tr. 264-270)

In a Disability Report – Appeal, Plaintiff stated that she needed to see a psychologist because of major mood swings. She also had gallstones. Plaintiff was experiencing increased rage, forgetfulness, and sleep. She was diagnosed with bipolar disorder since her last disability report. Plaintiff received counseling from Rebecca and psychiatric treatment from Dr. Wang and Dr. Simon. She reported that she had trouble getting ready for appointments and experienced everyday struggles. (Tr. 287-92)

## III. Medical Evidence

On January 8, 2007, Plaintiff saw Linda Picker, RN, MSN, Adult Nurse Practitioner, for chronic health problems. Plaintiff reported that Wellbutrin did not help with depression and anxiety. Nurse Picker also noted that Plaintiff possibly had strep throat. She gave samples of Cymbalta and prescribed Amoxicillin. On February 15, 2007, Nurse Picker noted that Plaintiff's depression was improving on Cymbalta. She also assessed hypertension; hyperlipidemia; bilateral carpal tunnel syndrome, right greater than left; acne; asthma; and allergic rhinitis. Nurse Picker prescribed acne swabs and gave Plaintiff samples of Cymbalta. (Tr. 343-44)

7

Plaintiff first saw Dr. Beth Zimmer on October 15, 2007. Plaintiff reported being hypertensive for years, with her blood pressure increasing slowly. She also reported a lifetime history of depression and stated she had been on every antidepressant. Plaintiff had been on Cymbalta for the past year, which seemed to work for her depression and anxiety. Dr. Zimmer noted that Plaintiff was alert, active, obese, and in no acute distress. She assessed hypertension, not quite controlled; depression with possible bipolar component; asthma that was stable; migraine headaches; and multiple stressors. Dr. Zimmer refilled Plaintiff's medications and encouraged her to work on her weight management and blood pressure. (Tr. 315)

Plaintiff presented to SSM DePaul Hospital on November 7, 2007 for a syncope episode while gambling in a casino. She reported that her hands and legs tingled, and she felt cold. Plaintiff also reported that she was dizzy and felt as though she would pass out due to upper abdominal pain. Plaintiff was admitted to the hospital for further testing. On discharge, Dr. Fatima A. Khan assessed probable vasovagal syncope secondary to back pain and abdominal pain, with secondary diagnoses of hypertension, anxiety disorder, depression, and asthma. Dr. Khan advised Plaintiff to continue her medications, exercise regularly, lose weight, and drink adequate fluid. (Tr. 361-93)

Plaintiff returned to Dr. Zimmer for a follow-up exam on November 16, 2007, after her ER visit. Plaintiff reported that Cymbalta no longer worked and that much of her physical symptoms were provoked by anxiety. Dr. Zimmer assessed history of depression with a strong family history of bipolar disorder; history of migraine headaches; history of asthma; and near syncope, possibly aggravated by a dual dosing of Enalapril. Dr. Zimmer also recommended a psychiatric consultation and a prescription for Topamax. However, Plaintiff indicated that she was losing her insurance in December and had no extra cash. (Tr. 313-14)

8

Plaintiff followed up with Dr. Zimmer on March 19, 2008 and reported she still felt severely depressed. She noted she would often spend most of the day asleep and eat one meal a day. Plaintiff believed that Cymbalta helped but reported continued problems with her asthma, which caused her to become panicky. Dr. Zimmer assessed hypertension with borderline control, asthma, and probable bipolar disorder with depression. Dr. Zimmer prescribed Topamax and increased Plaintiff's Cymbalta dosage. Although Plaintiff had been able to extend her insurance, she was unsure how long it would be extended and was therefore reluctant to see a psychiatrist. (Tr. 311-12)

When Plaintiff returned to Dr. Zimmer on July 8, 2008, she complained of multiple medical problems but reported doing better with Topamax. Plaintiff noted that to her she still had some issues and had been under significant stress. Her asthma seemed stable with the current regimen. Dr. Zimmer assessed bipolar disorder, stable; and hypertension. (Tr. 309) Dr. Zimmer next saw Plaintiff on March 30, 2009 and noted that Plaintiff was under much stress. She also reported paranoia while driving; fear that a grandchild was going to fall; and fear of death and hospitals. Gambling and shopping released her stress. Plaintiff noted a manic episode 2 to 3 weeks ago. Dr. Zimmer diagnosed unspecified migraines, unspecified essential hypertension, bipolar I disorder, and unspecified asthma. (Tr. 327)

Plaintiff returned to Dr. Zimmer on April 21, 2009 for depression. She complained of being overly sleepy, with a black cloud present but tolerable. Although she felt better with Seroquel and was no longer seeing things, the Cymbalta wore off at the end of the day, and the depression increased. On examination, Plaintiff's affect and behavior were normal. Dr. Zimmer assessed bipolar disorder, stable. (Tr. 322-24) On April 30, 2009 Plaintiff reported improved depression and no manic symptoms, but she did complain of somnolence and a 20 pound weight

9

gain. Dr. Zimmer assessed major depression, bipolar disorder improving but with significant weight gain, and knee pain. (Tr. 325-26)

Plaintiff saw Dr. Dunet Belancourt on June 17, 2009 for a general checkup as a new patient. Dr. Belancourt noted a history of bipolar disorder. Plaintiff also reported carpal tunnel of the bilateral hands, chronic urinary tract infections, knee pain, asthma, and migraine syndrome. (Tr. 336) Plaintiff followed up with Dr. Belancourt on July 8, 2009 for bipolar disorder and high blood pressure. (Tr. 337)

P. Simon, D.O., conducted a psychiatry initial evaluation on August 20, 2009. Plaintiff complained of a history of bipolar disorder and depression. Plaintiff's general appearance was appropriate, and the mental status examination was normal. Dr. Simon assessed bipolar affective disorder with a GAF of 50.[1] He referred Plaintiff to counseling and prescribed medications. (Tr. 404-05)

Plaintiff returned to Dr. Belancourt on September 18, 2009 and reported having a lot of discomfort in the chest area, as well as confusion and memory lapses. Dr. Belancourt diagnosed gallstones and bipolar disorder. (Tr. 439)

Dr. Paul Vatterott M.D. examined Plaintiff on October 19, 2009 on behalf of Disability Determinations. He diagnosed anxiety and depression but did not have current information to assess her ability to perform work-related functions. (Tr. 342)

---

[1] Under the Diagnostic and Statistical Manual of Mental Disorders, a GAF score of 41 to 50 indicates "serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR)* 34 (4th ed. 2000). A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning," and a GAF score of 61 to 70 indicates "some mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

Ricardo Mareno, Psy.D., completed a psychiatric review technique form on October 30, 2009. Dr. Mareno indicated Plaintiff had mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in concentration, persistence, and pace. Dr. Mareno found Plaintiff partially credible. (Tr. 345-356) Dr. Mareno also completed a mental residual functional capacity assessment and opined that Plaintiff would be moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek, without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond properly to criticism from supervisors; get along with coworkers or peers without distracting them, or exhibiting behavioral extremes; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Dr. Marino concluded Plaintiff was capable of performing simple repetitive tasks, and he recommended a limited social environment to further reduce stress. (Tr. 357-59)

Plaintiff returned to Dr. Simon on October 22, 2009, December 10, 2009, February 25, 2010, March 23, 2010, April 22, 2010, and June 24, 2010. Dr. Simon diagnosed bipolar affective disorder II and a GAF of 50 to 55. (Tr. 398-402) He completed a mental residual functional capacity questionnaire on July 2, 2010, indicating that he started seeing Plaintiff bi-monthly in August 2009. Plaintiff's diagnoses were bipolar type II; high cholesterol, high blood pressure, asthma, and restless leg syndrome; and a GAF of 55. Plaintiff indicated that she felt scatterbrained but Dr. Simon had no supporting objective findings. Signs and symptoms included decreased energy; mood disturbance; difficulty thinking or concentrating; persistent

11

disturbances in mood or affect; paranoid thinking or inappropriate suspiciousness; intense and unstable interpersonal relationships and impulsive and damaging behavior; perceptual or thinking disturbances; emotional liability; manic syndrome; easy distractibility; and sleep disturbance. Dr. Simon indicated Plaintiff was unable to meet competitive standards of unskilled work with regard to her ability to complete a normal workday or workweek without interruptions from psychologically based symptoms. He opined that on average, Plaintiff would miss about 3 days of work per month. However, he found Plaintiff's mental abilities and aptitudes did not otherwise preclude her from performing unskilled work, semi-skilled and skilled work, and particular types of jobs. (Tr. 406-411)

Dr. Simon repeated the diagnosis of bipolar affective disorder II in bi-monthly progress reports from September 3, 2010 through April 9, 2012. Plaintiff reported feeling angry and experiencing anxiety attacks and crying spells. On September 29, 2011, Plaintiff stated that she felt a little better but still messed up. On April 9, 2012, she was better with decreased mood swings, better sleep, and only occasional anger. Dr. Simon assessed a GAF of 65. (Tr. 412-22)

Plaintiff saw Dr. Belancourt on March 11, 2011 and December 1, 2011 for complaints of asthma. Dr. Belancourt prescribed prednisone. (Tr. 429, 431) Dr. Belancourt completed a physical residual functional capacity on March 26, 2012 noting that Plaintiff's diagnoses included: bipolar, mania, ADHD, extreme anxiety, sleep apnea, arthritis, gout, obesity, gall stone pain, GERD, carpal tunnel syndrome, and chronic urinary tract infections. Her prognosis was guarded. Dr. Belancourt opined that Plaintiff's symptoms constantly interfered with her attention and concentration such that Plaintiff was incapable of even low stress jobs. Plaintiff could only sit for 15 minutes at a time; stand for 10 minutes; sit less than 2 hours in an 8 hour workday; and stand and/or walk less than 2 hours in an 8 hour workday. Plaintiff was limited by

12

bilateral knee pain and required knee replacement surgery. Dr. Belancourt further opined that Plaintiff needed a job that allowed shifting from standing, walking, or sitting at will. Further, she required more than 10 unscheduled breaks in a day and needed to elevate the legs about half of the time. He stated that Plaintiff could never to lift or carry; rarely stoop or bend; and never crouch, squat, climb ladders, or climb stairs. She had significant limitations with regard to her ability to grasp, turn, twist, perform fine manipulation, and reach. Dr. Belancourt estimated Plaintiff would miss more than 4 days of work per month due to severe bipolar mania and problems with self-control, temper flares, paranoia, and lack of focus and attention. Dr. Belancourt concluded Plaintiff was totally and permanently disabled due to her mental disorder, and he did not believe she was capable of any occupational duties. (Tr. 456-60)

Plaintiff attended an occupational therapy session on April 4, 2012. (Tr. 449) The therapist noted Plaintiff had significant confusion, emotional instability, and impaired cognition. Plaintiff had left shoulder pain and pain in both knees. Plaintiff had a history of asthma and experienced shortness of breath. The therapist further noted Plaintiff's mental state affected her ability to perform home-making activities, maintain a job, and take care of her children. Plaintiff was unable to make decisions and unable to keep time. (Tr. 449-50)

On April 18, 2012, physical therapist James Anthony completed a physical residual functional capacity questionnaire, noting Plaintiff had left shoulder pain and bilateral knee pain. The prognosis was poor. Depression affected Plaintiff's physical condition, with pain and other symptoms being severe enough to interfere with her attention and concentration constantly. Mr. Anthony opined Plaintiff was incapable for even low stress jobs. She was only able to sit for about 10 to 15 minutes at one time; stand or walk for about 5 minutes; sit about 2 hours in an 8 hour workday; and stand and walk less than 2 hours in an 8 hour workday. Plaintiff needed

13

periods of walking around during an 8 hour workday and required a position that allowed shifting at will from sitting, standing, or walking. Mr. Anthony stated Plaintiff could occasionally lift less than 10 pounds, rarely lift 10 pounds, and never lift 20 pounds or more. Plaintiff's legs were to be elevated about 25% of the day. Plaintiff was never to twist, crouch, squat, or climb ladders. She could rarely stoop, bend, or climb stairs. Mr. Anthony estimated Plaintiff would miss about 4 days of work per month. She was further limited in her ability to use her hands, fingers, and arms. Mr. Anthony opined that Plaintiff had been unable to work for the past 3 years due to left shoulder and bilateral knee pain. (Tr. 451-55)

Dr. Paul Simon completed a mental residual functional capacity questionnaire on November 18, 2012. Dr. Simon indicated Plaintiff had a bipolar disorder and a GAF of 65. She experienced occasional anger, and her prognosis was fair. Plaintiff's signs and symptoms included: pathological dependence, passivity or aggressivity; persistent disturbances of mood or affect; intense unstable interpersonal relationships and impulsive and damaging behavior; emotional lability; deeply ingrained maladaptive patterns of behavior; sleep disturbance; and history of multiple physical symptoms of several years duration beginning before age 30, that caused an individual to take medicine frequently, see physicians often, and alter life patterns significantly. Dr. Simon opined that with regard Plaintiff's mental abilities needed to do unskilled work, she was unable able to meet competitive standards in completing a normal workday/workweek without interruptions from psychologically-based symptoms; accepting instructions/respond properly to criticism from supervisors; getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; and dealing with normal work stress. Dr. Simon estimated Plaintiff would miss about 2 days of work per month. (Tr. 423-428)

14

## IV. The ALJ's Determination

In a decision dated July 17, 2012, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2012. She had not engaged in substantial gainful activity since her alleged onset date of January 1, 2008. The ALJ determined that Plaintiff's severe impairments included bipolar disorder, hypertension, migraine headaches, gallstones, and obesity. However, Plaintiff did not have an impairment of combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ noted that she had considered obesity in combination with Plaintiff's other impairments and in the context of the overall evidence. The ALJ then considered Plaintiff's mental impairments and found that they did not meet the criteria of "paragraph B." The ALJ found that Plaintiff had no restriction in activities of daily living or in social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation of an extended duration. With regard to "paragraph C" criteria, the ALJ determined that the objective evidence failed to meet such criteria. (Tr. 9-14)

The ALJ carefully considered the entire record and determined that Plaintiff had the residual functional capacity ("RFC") to perform a range of light work. Specifically, Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; stand or walk for six hours in an eight-hour workday; and sit for six hours in an eight-hour workday. The ALJ also noted specific limitations, finding that Plaintiff must avoid occasional exposure to extreme cold; avoid fumes, odors, dusts, and gases; and could understand, remember, and carry out at least simple instructions and non-detailed tasks. The ALJ gave little weight to the opinions of Dr. Simon, as they were inconsistent with his treatment notes and the treatment notes of other treating physicians, as well as internally inconsistent. The ALJ also gave little weight to Dr.

15

Belancourt's opinion regarding Plaintiff's physical and mental impairments, as he did not support his opinion with objective findings, he was not treating Plaintiff for psychiatric impairments, and he relied on Plaintiff's subjective complaints to establish his opinion. With regard to physical therapist Mr. Anthony, the ALJ gave his opinion no weight because Mr. Anthony was not an acceptable medical source, and he examined Plaintiff only once. In short, the ALJ noted that the medical evidence did not reflect treatment or objective tests to support plaintiff's claims that her physical impairments were disabling. Further, the medical evidence pertaining to Plaintiff's mental impairments supported the GAF findings of only mild to moderate difficulties in functioning. (Tr. 14-21)

The ALJ determined that Plaintiff was capable of performing her past relevant work as a convenience store clerk. The ALJ noted that this work did not require the performance of work-related activities precluded by Plaintiff's RFC. The ALJ relied upon the VE's testimony to find that, in addition to retaining the ability to perform past relevant work, Plaintiff was capable of performing other jobs in the national economy, including order caller, mail sorter, and cashier. Thus, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from January 1, 2008 through the date of the decision. (Tr. 21-24)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

16

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe physical or mental impairment or combination of impairments which meets the duration requirement; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir.2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when

17

required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.* at 1354.

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the *Polaski*[2] factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## VI. Discussion

Plaintiff raises two arguments in her Brief in Support of the Complaint. First, she asserts that the ALJ failed to support the RFC finding with substantial evidence from the record. Next,

---

[2]  The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

Plaintiff contends that the VE's testimony does not constitute substantial evidence because the hypothetical question does not capture the concrete consequences of Plaintiff's impairment. The Defendant maintains that substantial evidence supports the ALJ's RFC determination and that the ALJ properly included the limitations he found credible in the hypothetical posed to the VE. The undersigned finds that the ALJ properly determined and supported Plaintiff's RFC and that the hypothetical question properly included Plaintiff's impairments.

## A. The ALJ's Residual Functional Capacity Assessment

With regard to Plaintiff's residual functional capacity, "a disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004) (citation omitted). The ALJ determines a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 404.1545(a)(1).

At the outset, the Court notes that Plaintiff's activities are inconsistent with her allegations of disability. The record demonstrates that Plaintiff reported taking her kids to school, eating out at restaurants, going to movies, shopping, and gambling. She was able to attend her son's wedding in Florida. (Tr. 64-67) An ability to engage in a number of daily activities detracts from Plaintiff's credibility. *See, e.g., Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (stating that plaintiff was able to vacuum wash dishes, do laundry, cook, shop, drive, and walk were inconsistent with her subjective complaints and diminished her credibility); *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) (affirming the ALJ's credibility

19

analysis where the plaintiff took care of her child, drove, fixed simple meals, performed housework, shopped, and handled money); *Slack v. Astrue*, No. 4:07CV1655 RWS, 2009 WL 723832, at *14 (E.D. Mo. March 17, 2009) (finding plaintiff's ability to hunt for small game, prepare meals, and do some yard work was inconsistent with allegations that he needed to spend most of the day resting).

The record also shows that the ALJ properly considered the medical evidence and based the RFC determination on the evidence contained in the record. With regard to Plaintiff's mental health treatment with Dr. Simon, the Court notes that "[a] treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted); *see also* SSR 96-2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). The ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. *Goetz v. Barnhart*, 182 F. App'x 625, 626 (8th Cir. 2006). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." *Swarnes v. Astrue*, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding that the ALJ properly discounted a treating physician's opinion where it consisted of checklist forms, cited no medical evidence, and provided little to no elaboration).

Here, the ALJ assessed Plaintiff's treatment history with Dr. Simon, highlighting that during her most recent sessions with Dr. Simon, Plaintiff was improved, and her mental status examinations were essentially normal. (Tr. 412-22) Her GAF was 55 to 65, indicating only mild to moderate symptoms.[3] Further, the ALJ noted that Plaintiff reported situational stressors as the cause of her occasional yelling or crying. Depression due to situations such as economic or employment factors supports a finding that the impairment does not result in significant functional restrictions. *Dunahoo v. Apfel*, 241 F.3d 1033, 1039-1040 (8th Cir. 2001); *Shipley v. Astrue*, No. 2:09CV36MLM, 2010 WL 1687077, at *12 (E.D. Mo. April 26, 2010).

Additionally, the record indicates that Plaintiff's mental impairments improved with medication. "An impairment which can be controlled by treatment or medication is not considered disabling." *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted); *see also Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) ("There is substantial evidence that, when taken as directed, the medication [plaintiff] was prescribed was successful in controlling his mental illness."). Although Dr. Simon opined in both mental residual functional capacity questionnaires that Plaintiff's mental impairments restricted her ability to work, he also noted that he did not have objective findings supporting Plaintiff's claim that she felt scatterbrained. (Tr. 406) Further, the clinical findings in the most recent questionnaire indicated that Plaintiff merely exhibited occasional anger. Because Dr. Simon's opinions were unsupported by objective tests and were inconsistent with his own treatment notes, the ALJ properly discredited

---

[3] The Court notes that DSM-V was released in 2013 and replaced the DSM-IV. The DSM-V "no longer uses GAF scores to rate an individual's level of functioning because of 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" *Alcott v. Colvin*, No. 4:13-CV-01074-NKL, 2014 WL 4660364, at *6 (W.D. Mo. Sept. 17, 2014) (citing *Rayford v. Shinseki*, 2013 WL 3153981, at *1 n.2 (Vet. App. 2013) (quoting the DSM-V)). However, because the DSM-IV "was in use when the medical entries were made and the [ALJ's] decision was issued in this matter, the Global Assessment of Functioning scores remain relevant for consideration in this appeal." *Rayford*, 2013 WL 3153981, at *1 n.2.

21

the opinions. *See Choate v. Barnhart*, 457 F.3d 865, 870-71 (8th Cir. 2006) (finding that ALJ properly discredited physician's Medical Source Statement where treatment notes never mentioned restrictions or limitations to the plaintiff's activities).

As stated above, the ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. *Goetz*, 182 F. App'x at 626. Additionally, the ALJ may properly give little weight to an opinion that consists of vague, conclusory statements or is merely a checklist with no elaboration. *Swarnes*, 2009 WL 454930, at *11; *Wildman*, 596 F.3d at 964. As Dr. Simon's questionnaire contained limitations far more severe than indicated in the treatment record and failed to include any medical evidence or explanation, the ALJ properly gave the opinion little weight.

Likewise, the ALJ properly discounted the opinions of Dr. Belancourt and James Anthony. Although Dr. Belancourt listed significant physical limitations, the record contains very little evidence of medical treatment for Plaintiff's alleged physical impairments, including bilateral knee pain. The ALJ therefore gave little weight to his opinion of disabling physical limitations. *See Davidson v. Astrue* , 501 F.3d 987, 991 (8th Cir. 2007) (discounting the treating physician's RFC assessment where treatment notes contained few hints of the serious physical limitations). Dr. Belancourt's opinion regarding Plaintiff's inability to work was based primarily upon Plaintiff's mental impairments, for which Dr. Belancourt was not treating Plaintiff. *See Brown v. Astrue*, 611 F.3d 941, 953 (8th Cir. 2010) (affirming the ALJ's reason for discounting the treating physician's opinion because the physician did not have specialized training in treating and diagnosing mental impairments). This assessment was not based on any clinical findings or objective testing. Instead, Dr. Belancourt relied on Plaintiff's subjective complaints

22

to formulate his opinion. *See Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011) (finding the ALJ properly discounted the physician's opinion where the limitations were based on the plaintiff's subjective complaints and not objective findings).

In addition, with regard to the physical therapist, the Court acknowledges that the ALJ may consider evidence regarding the severity of a plaintiff's impairment and how it affects his or her ability to work including medical sources such as nurse-practitioners, physicians' assistants, chiropractors, and therapists. 20 C.F.R. § 404.1513(d)(1). While the ALJ could, and indeed did, consider Mr. Anthony's opinions under the regulations, the ALJ was not obligated to give the opinions controlling weight. (Tr. 19-20) *See* Social Security Ruling, SSR 06-03p, 71 Fed. Reg. 45593-03 (Aug. 9, 2006) (distinguishing between "acceptable" and "not acceptable" medical sources and stating that only "acceptable medical sources" can provide evidence to establish the existence of a medically determinable impairment, give medical opinions, and can be considered treating sources whose opinions may be entitled to controlling weight). Further, the ALJ correctly noted that Mr. Anthony's one-time assessment showed only slightly reduced range of motion and was not supported by any objective findings or treatment notes. *See Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) (rejecting a medical opinion where the plaintiff only saw the source on three occasions, and the treatment notes failed to indicate any knowledge of plaintiff's ability to function in the workplace).

Contrary to Plaintiff's argument that the ALJ failed to rely on medical evidence in the record in determining Plaintiff's RFC, the Court finds that the ALJ's RFC assessment is supported by medical evidence contained in the record as a whole. The ALJ need not rely entirely on a particular doctor's opinion or choose between opinions. *Martise v.Astrue*, 641 F.3d 909, 927 (8th Cir. 2011). Here, the ALJ properly performed an exhaustive analysis of the

23

medical records and noted that none of the physician's treatment notes indicated serious functional restrictions. *Id.* at 926. Indeed, the ALJ added further limitations to the RFC finding that Plaintiff could perform light work based upon her asthma and her mental impairments allowing her to understand, remember, and carry out at least simple instructions and non-detailed tasks. (Tr. 21) Therefore, the undersigned finds that substantial evidence supports the ALJ's RFC determination.

## B. Hypothetical Question to the VE

Plaintiff next argues that the hypothetical question posed to the VE failed to include all of Plaintiff's limitations, and, therefore, the VE's response did not constitute substantial evidence. The Defendant responds that hypothetical question properly included only those impairments and restrictions that the ALJ found credible.

The undersigned agrees that the ALJ posed a proper hypothetical question to the VE and that the VE's testimony that Plaintiff could perform work was substantial evidence in support of the ALJ's determination. "A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) (quoting *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)). Further, where substantial evidence supports an ALJ's finding that a plaintiff's complaints were not credible, the ALJ may properly exclude those complaints from the hypothetical question. *Id.*

In the instant case, the ALJ included only those impairments and limitations that she found credible. The ALJ asked the VE to assume an individual limited to light exertional work. She should avoid fumes, odors, dust, and gases and could occasionally be exposed to extreme cold. Due to mental impairments, the individual was limited to unskilled work. (Tr. 46-47)

24

These limitations are consistent with medical and other evidence in the record and with the ALJ's RFC determination.

Therefore, the undersigned finds that "[t]he hypothetical was sufficient because it represented a valid assessment of [Plaintiff's] . . . limitations consistent with the evidence in the record." *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001). Because the hypothetical question properly set forth Plaintiff's limitations, the VE's testimony constituted substantial evidence upon which the ALJ could properly rely in determining that Plaintiff was not disabled. *Id.* Therefore, the undersigned finds that substantial evidence supports the ALJ's determination that Plaintiff had not been under a disability from January 1, 2008 through the date of the decision, and the Court will affirm the decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits is **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

Dated this __3rd__ day of March, 2015.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**